Gregory S. Cordrey *(Pro Hac Vice)*
Email: gcordrey@jeffer.com
JEFFER MANGELS & MITCHELL LLP
3 Park Plaza, Suite 1100
Irvine, California 92614-2592
Telephone: (949) 623-7200
Facsimile: (949) 623-7202

Jessica Bromall Sparkman *(Pro Hac Vice)*
Email: JSparkman@jeffer.com
JEFFER MANGELS & MITCHELL LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
Telephone: (310) 203-8080
Facsimile: (310) 203-0567

Kenneth R. Davis II (OSB #971132)
Email: daviskr@ballardspahr.com
Mohammed Workicho (OSB #186140)
Email: workichoM@ballardspahr.com
BALLARD SPAHR
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
Telephone: (503)778-2100
Facsimile: (503)778-2200

*Attorneys for Defendant and Counterclaim Plaintiff INFINITY X1 LLC*

IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **COAST CUTLERY CO.,** dba Coast Products, an Oregon corporation,<br><br>     Plaintiff and Counterclaim Defendant<br><br>     v.<br><br>**INFINITY X1 LLC,** a Nevada limited liability company,<br><br>     Defendant and Counterclaim Plaintiff. | Case No. 3:25-cv-1120-SI (Lead Case)<br>Case No. 3:25-cv-01281-SI<br><br>**INFINITY X1'S OPENING CLAIM CONSTRUCTION BRIEF** |

80213555

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENTS ..................................................1

II.   BACKGROUND ..........................................................................................................2

    A.    Overview of the '311 and '618 Patents..................................................................2

    B.    Asserted Claims ...................................................................................................5

III.  CLAIM CONSTRUCTION STANDARDS...........................................................................6

IV.   ARGUMENT ..............................................................................................................7

    A.    "lens"...................................................................................................................7

    B.    "Reflector" ........................................................................................................15

    C.    "broad-beamed lighting mode," "flood beam," "focused lighting mode,"
        and "spot beam"..................................................................................................20

    D.    "light sources(s)" ..............................................................................................24

    E.    "Forward-directed light sources"........................................................................27

    F.    "Peripheral light source".....................................................................................30

V.    CONCLUSION...........................................................................................................33

80213555

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Genentech, Inc. v. Chiron Corp.*,
   112 F.3d 495 (Fed. Cir. 1997)........................................................................................25

*Honeywell Int'l v. ITT Indus., Inc.*,
   452 F.3d 1312 (Fed. Cir. 2006)......................................................................................19

*Kara Tech. Inc. v. Stamps.com Inc.*,
   582 F.3d 1341 (Fed. Cir. 2009).......................................................................................7

*Merck & Co. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364 (Fed. Cir. 2005).......................................................................................8

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)..................................................................................................21, 23

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)......................................................................................25

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)................................................................ *passim*

*Stubmo v. Eastman Outdoors, Inc.*,
   508 F.3d 1358 (Fed. Cir. 2007).......................................................................................8

**Statutes**

35 U.S.C. §112(b) ................................................................................................................20

i

80213555

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 9,615 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel. Pursuant to consistent with Local Rule 7-1(a), the parties made a good faith effort through telephone conferences to resolve the dispute and have been unable to do so.

## I.     INTRODUCTION AND SUMMARY OF ARGUMENTS

This case presents a straightforward claim construction dispute. Where Infinity X1 LLC ("Infinity") seeks to construe a term, its proposal stays true to the intrinsic record and purpose of U.S. Patent Nos. 11,852,311 ("'311 patent") and 12,203,618 ("'618 patent") (collectively, the "Asserted Patents")[1]. Conversely, Coast Cutlery Co. ("Coast") seeks narrow, litigation-driven constructions that are belied by the claims, specification, prosecution history, and extrinsic evidence. Coast's proposals share common themes, often imposing structural, material, or functional limitations found nowhere in the claims or importing embodiments from the patent specification into the claims themselves against Federal Circuit Precedent.

Specifically, Coast's proposed construction of "lens" exemplifies its litigation-driven approach throughout this brief: importing the specification's modifier "optical" into the bare claim term "lens" to narrow the claims beyond what the patentee actually required. The claims say "lens." They do not say "optical lens." That distinction is not accidental; the patentee used "optical lens" when describing preferred embodiments in the specification and chose the broader term "lens" when drafting the claims. Under black-letter *Phillips* methodology, that distinction controls. A

---

[1] The '311 and '618 patents are attached as Exhibits 1 and 2, respectively, to the Declaration of Gregory Cordrey ("Cordrey Dec."), filed concurrently herewith.

1

construction that collapses "lens" into "optical lens" renders the patentee's deliberate choice of claim language meaningless and imports an unclaimed adjective into the claims in precisely the manner the Federal Circuit has repeatedly condemned.

Coast's other arguments similarly fall flat. First, Coast's construction of "reflector" imposes multiple material and shape limitations not present in either the claims or specifications. Second, its attempt to argue indefiniteness for the terms "broad-beamed lighting mode," "flood beam," "focused lighting mode," and "spot beam" should be rejected; Coast, its expert, and those skilled in the art readily understand the meaning of "flood" and "spot," including by using them in Coast's own accused products and its patents. Third, Coast's interpretation of "light source(s)" ignores the express structure provided by the claim language. Fourth, "forward-directed light sources" have a particular meaning in the context of the Asserted Patents, and Coast's construction would disregard claimed distinctions with peripheral and downward-directed light sources. Finally, Coast seeks to read out the core inventive concept of the Asserted Patents in its proposed construction for "peripheral light source" in contradiction of the intrinsic record.

For the following reasons, the Court should reject Coast's constructions and adopt those proposed by Infinity.

## II.    BACKGROUND

### A.    Overview of the '311 and '618 Patents

The Asserted Patents disclose a headlamp that includes one or more light sources that are configured to illuminate specified view areas with respect to the user wearing the headlamp.[2] The Asserted Patents describe a broad view headlamp with a housing that contains multiple lighting compartments. Each compartment is equipped with light source(s) that preferably comprise one or

---

[2] The '311 and '618 patents share a common specification.

80213555

more LEDs that cooperate to illuminate targeted areas such as forward, peripheral, and downward regions. ('311 patent 3:4-12; '618 patent 3:4-12.) These light sources are activated individually or in combination to achieve customizable lighting effects, enabling the headlamp to cover a total view area of up to 220 degrees by extending illumination to the far peripheral boundaries of human vision, *i.e.*, 110 degrees to each side of center. ('311 patent 3:16-50, FIGS. 1-2; '618 patent 3:16-50, FIGS. 1-2.)

Central to the invention are forward-directed light sources, such as elements 35, 40, and 45, which are configured to illuminate the central portion of a user's vision. The Asserted Patents specify that light source 35 provides a focused spot beam forward, light source 40 delivers a broad flood beam forward, and light source 45 offers night vision lighting (e.g., red or blue-green) also directed forward, all housed in one or more compartments that direct light primarily in front of the headlamp. ('311 patent 3:41-47; '618 patent 3:41-47.) These forward-directed sources contrast with the peripheral ones, ensuring differentiated illumination. The central view receives concentrated, task-oriented light while integrable peripherals enable broader coverage.

The Asserted Patents further innovate with peripheral light sources, exemplified by elements 50 and 52, which are configured to illuminate the far peripheral portion of a user's vision, extending to 110 degrees left and right of center. ('311 patent 3:16-50; '618 patent 3:16-25-50.) These sources provide lighting to the sides and rear of the headlamp, enabling detection of motion or objects in low-detail sideways fields of view, consistent with vision science delineating far peripheral regions. Positioned in dedicated compartments, they operate independently or in tandem with forward sources to expand the overall illuminated field to at least 220 degrees, addressing gaps in conventional headlamps that neglect these extreme peripheral areas. ('311 patent Abstract, 3:47-49; FIGS. 1-2; '618 patent Abstract, 3:47-49, FIGS. 1-2.) Figure 1 of the Asserted Patents,

3

reproduced below, illustrates exemplary forward-directed light sources 35, 40 and 45 ('311 patent 3:41-47; '618 patent 3:41-47), downward-directed light source 55 ('311 patent 3:49-50; '618 patent 3:49-50) and peripheral-directed light sources 50 and 52. ('311 patent 3:47-49;'618 patent 3:47-49.)



FIG. 1

Reflectors may play a critical role in the headlamp's functionality, described as components positioned within one or more lighting compartments to gather and direct light generated by the LEDs to specified view areas ('311 patent 3:8-12; '618 patent 3:8-12), such as forward for central illumination or angled sideways for far peripheral coverage. The patent's reflectors are functionally oriented, including in peripheral compartments to direct and project light outward to 110 degrees, ensuring the light reaches the far peripheral zones rather than focusing solely forward.

Complementing these elements are lenses. Elements 60, 65, 70, and 75 serve to protect the light sources while optionally focusing or widening light output. In the inventive headlamp, these lenses may work in concert with the light sources and reflectors to deliver light to a specified area. ('311 patent FIG. 1; '618 patent FIG. 1.)

Together, these components enable the headlamp to provide versatile, user-controlled lighting modes that illuminate specified view areas comprehensively. For instance, activating

4

forward-directed sources with peripheral ones covers central detail-oriented tasks while simultaneously lighting far peripheral regions for situational awareness, and adding the downward source 55 illuminates the ground below. ('311 patent 3:38-67; '618 patent 3:38-67.) This integrated design represents a significant advancement over prior art by utilizing the cooperative function of light sources, reflectors, and lenses to achieve a 220-degree view without mechanical adjustments. This differentiated illumination of specified view areas is central to the patents' novelty, distinguishing them from prior art headlamps limited to narrow forward beams." ('311 patent Abstract; '618 patent Abstract.)

### B.    Asserted Claims

The asserted claims of the '311 patent are independent claim 1 and dependent claims 2-7 and 10.  The asserted claims of the '618 Patent are independent claim 11 and dependent claim 12 (collectively with the asserted claims of the '311 patent, the "Asserted Claims").[3]  The Asserted Claims are directed to a headlamp with multiple light sources and a lighting control module that selectively activates those light sources according to different lighting modes, including a mode that combines light sources to create a total view area wider than any individual source alone. The '311 patent (claim 1) requires more structural specificity, each light source must include at least one LED, a lens, and a reflector, while the '618 patent (claim 11) recites light sources without requiring those specific components. The dependent claims of the '311 patent add further limitations: claims 2-5 introduce forward-directed light sources with a third LED/lens/reflector and further narrow to specific beam types (spot beam in claim 3, flood beam in claim 4, colored beam for night vision in claim 5); claims 6-7 specify that the first and second light sources are peripheral and add a periphery-only lighting mode; and claim 10 requires the combined view area to be at least

---

[3] The full text of the claims is appended to this brief at Appendix A.

220 degrees. The sole dependent claim of the '618 patent, claim 12, adds forward-directed light sources and requires both a spot beam mode and a flood beam mode from that group.

## III.    CLAIM CONSTRUCTION STANDARDS

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "[T]he words of a claim 'are generally given their ordinary and customary meaning,'" which "is the meaning that the term would have to a person of ordinary skill in the art in question at the time" of the patent's effective filing date. *Phillips,* 415 F.3d at 1312-13. In determining a claim's ordinary and customary meaning, a court will consider "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* (quoting Innova, 381 F.3d at 1116).

The language of "the claims themselves provide substantial guidance as to the meaning of particular claim terms," and "[t]he context in which a claim term is used in the asserted claim can be highly instructive." *Id.* "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term." *Id.*

In addition to the claims themselves, courts should consider the specification in construing claim terms, as the terms "are part of 'a fully integrated written instrument.'" *Phillips,* 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 978). As the Federal Circuit has stated: "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitrionics,* 90 F.3d at 1582). Importantly, though, limitations from the specification should not be imported into the claims, and claims should not necessarily be confined to the "very specific embodiments of the invention" in

6

the specification. *Id*. at 1323; *see also Kara Tech. Inc. v. Stamps.com Inc.,* 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.").

Courts may also consider extrinsic evidence in construing a claim, although "it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id*. (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp*., 388 F.3d 858, 862 (Fed. Cir. 2004)). Expert testimony may also be useful to a court, to the extent that it "provide[s] background on the technology at issue, [explains] how an invention works, [ensures] that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or [establishes] that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id*. Expert testimony, however, "that is clearly at odds with the claim construction mandated by the . . . written record of the patent" should be discounted. *Id*. (quoting *Key Pharms. v. Hercon Labs. Corp*., 161 F.3d 709, 716 (Fed. Cir. 1998)).

## IV.    ARGUMENT

### A.    "lens"

| Claim Term/Phrase | Infinity's Proposed Construction | Coast's Proposed Construction |
|---|---|---|
| "lens" | A light-transmissive material positioned over a light source<br><br>[Alternatively, a light-transmissive element positioned over a light source to transmit, shape, or protect the light output.] | A piece of transparent material with a curved front and/or back surface that refracts light |

#### 1.    The Claim Language Supports Infinity's Construction

The claims of the '311 patent use the term "lens" without modifiers or requiring a specific material, shape or specific optical properties. (*See, e.g*., '311 patent, cl. 1 (reciting only that a first

and second lens "illuminate a [first/second] view area in a [first/second] fixed direction").) Nothing in the claims requires transparent material, curved surfaces, or refraction of light.[4] For example, the claims deliberately omit "optical." Instead, as noted, "lens" is recited as a structural component of a "light source comprising a [LED], a [first/second] lens, and a [first/second] reflector" ('311 patent, cl. 1) without functional qualifiers beyond illuminating an area.

Coast's own expert conceded these points. Mr. Law admitted that "[t]he claims do not say optical lens" (Cordrey Dec., Ex. 4 ("Law Dep."), p. 57, ll. 1-2), that the patent "does not call out needing a curved surface" (*id.* at p. 55, ll. 10), that nothing in the claims specifically ties the lens to being "transparent" (*id.* at p. 58, ll. 15-16), and that he did not "see the exact term refracts" in the claims (*id.* at p. 54, ll. 19). These concessions confirm that Coast's proposed curvature, transparency, and refraction limitations are not grounded in the claim language.

Where the claims intend to describe beam-width modification (*i.e.*, refraction), they do so expressly and separately. For example, dependent claims recite lenses "configured to increase" beam width. (*See, e.g.*, '311 patent, cl. 8; '618 patent, cl. 14.) A POSITA would understand that if "lens" itself were limited to a refractive optical element that necessarily alters beam width, these dependent claims would be rendered superfluous. (Cordrey Dec., Ex. 3 ("Windom Decl."), ¶ 55.) Claim constructions that render claim language redundant are disfavored. *See Stubmo v. Eastman Outdoors, Inc.,* 508 F.3d 1358, 1362 (Fed. Cir. 2007) (noting that the court has "denounced" claim construction that renders phrases "superfluous"); *Merck & Co. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

---

[4] Coast proposed these limitations based on its litigation-driven approach to claim construction. (Cordrey Dec., Ex. 5 ("Law Declaration"), ¶ 40 (contending that Coast's accused headlamp is "not transparent and has no concave or convex surface that refracts light").

80213555

Accordingly, based on the claim language, a POSITA would understand that "lens" is not limited to a curved, refractive optic but instead refers to a light-transmissive component positioned over a light source, consistent with Infinity's proposed construction.  (Windom Decl. ¶ 57.)

### 2. The Specification Confirms a Broad, Non-Refractive Understanding of "Lens"

The specification also does not define "lens" as requiring refraction (or beam-width modification functionality) or curved surfaces, nor does it disclaim lenses that serve protective or transmissive functions. In lighting devices, particularly headlamps and flashlights, a POSITA would understand "lens" to encompass a light-transmissive material positioned over a light source, which may be flat or non-refractive and may serve purposes such as protection, durability, diffusion, or glare control. (Windom Decl. ¶ 53.) Coast's construction depends entirely on importing the specification's references to "optical lenses" into the claims. Mr. Law admitted that although "the terminology of the claims does not specifically state optical lens," he imported the specification's references to "optical lenses" into the claims. (Law Dep., p. 60, ll. 1-7; p. 57, ll. 14-16). That is precisely the "confining the claims to [] embodiments" that the Federal Circuit has "repeatedly warned against." *Phillips*, 415 F.3d at 1323.

Mr. Law further relied on cherry-picked portions of the specification regarding spreading light as the basis for the reading "optical lens" into the claims. Yet he later conceded that a diffuser, "which is not an optical lens," can spread light (Law Dep., p. 61, ll. 18-21), undermining the suggestion that only a curved, refractive optical element can perform the functions described in the dependent claims.

Under well-established claim construction principles, limitations from preferred embodiments, particularly unclaimed adjectives, should not be imported into the claims absent clear lexicography or disavowal. See *Phillips*, 415 F.3d at 1314 (claims are not limited by

9

adjectives in the spec unless clearly intended).  Coast's reliance on the specification's use of "optical lens" actually defeats its own argument. The specification uses "optical lens" as a modifier-plus-noun construction, "optical" modifies "lens", precisely because "lens" alone does not convey the optical, refractive properties Coast wants to import into the claims. If "lens" already meant "a piece of transparent material with a curved surface that refracts light," the modifier "optical" would be entirely superfluous. The patentee would have had no reason to specify "optical lens" in the specification if "lens" already carried that meaning.

This is precisely the logic the Federal Circuit applies when construing claim terms in light of specification language. Where a specification uses a modified form of a term (e.g., "optical lens") while the claims use only the base term (e.g., "lens"), the difference is presumed meaningful. The patentee chose "lens" for the claims and "optical lens" for the specification's preferred embodiments. Adopting Coast's construction would erase that distinction entirely, treating the claims as if they recite "optical lens" when they do not.

Moreover, the specification's use of "optical lens" in the detailed description and Abstract refers specifically to the preferred embodiment's lenses as they function in the exemplary headlamp, lenses configured to increase beam distance and spread—functions not recited in independent claim 1. But claim construction requires that limitations from preferred embodiments not be imported into the claims absent clear lexicography or disavowal. *Phillips*, 415 F.3d at 1323. The specification's description of preferred optical lenses does not constitute lexicography, the patentee never said "the term 'lens' means an optical lens", and it does not constitute disavowal, because the patentee never disclaimed non-optical lenses from the scope of the claims. Without either lexicography or disavowal, the specification's preferred embodiment cannot narrow the claims. *Id*

10

### 3.    The Prosecution History Confirms That "Lens" Includes Protective, Non-Refractive Covers

The prosecution history further provides strong intrinsic support for Infinity's construction that "lens" includes protective, non-refractive covers. During prosecution of the '311 patent, the Examiner rejected claim 1 in part based on patent publication WO 2006/080918 A1 ("Gupta"), stating: "Regarding claim 1, Gupta discloses (in at least figs. 1-3) a headlamp comprising:…**a lens (118)**."  (Cordrey Dec., Ex. 6 ('311 patent file history, Office Action dated February 24, 2023), p. 4)  As shown below, Gupta's lens is not curved:



Figure 3

(Cordrey Dec., Ex. 7 (Gupta), Figure 3.)  Moreover, Gupta confirms that its disclosed lens does not refract light.  (*Id.* at 6:28-7:2 ("***protective lens*** cover 118 may be ***used to protect*** the LED 110 and reflectors 112, 116 from contamination…") (emphasis added).)  And the Applicant never argued against the Examiner's interpretation that Gupta's "lens" read onto the claimed lens limitation.  For example, the Applicant did not say "Gupta's element 118 is not a lens because it is flat and non-refractive." The Applicant did not argue "the claimed lens requires curved surfaces and refraction, which Gupta lacks." The Applicant made no argument whatsoever disputing the

11

80213555

Examiner's characterization of a flat, protective lens cover as a "lens" within the meaning of claim 1.

Mr. Law conceded that, upon reviewing Gupta, he did not see "anything … that calls out it having optical properties of adjusting the light" (Law Dep., p. 78, ll. 25 - 79, ll. 1). He further admitted that a "transparent protective lens cover" would be "just a front covering of a light," and he testified that, while it would not be an "optical lens," "*historically from a flashlight, you could consider it a lens*" (*id.* at p. 114, ll. 19-20) (emphasis added). These admissions are significant: both experts acknowledge that persons skilled in the art would understand that a protective cover can be considered a "lens," even if not an optical, refractive element.  (Windom Decl. ¶ 54.)

### 4.     Extrinsic Evidence Further Confirms the POSITA's Understanding of "Lens"

Extrinsic evidence further confirms how a POSITA would understand "lens" in the context of lighting devices. As Mr. Windom explains, everyday and technical usage routinely describes items such as sunglasses, safety glasses, automobile headlamp covers, and swim goggles as having "lenses," even though these prioritize protection, tinting, or diffusion rather than refraction or beam-width modification through refraction. (Windom Decl. ¶ 53.)  Dictionaries and industry references define "lens" to include light-transmissive materials that protect, cover, diffuse, or filter light, without requiring refraction or curved surfaces. For example:  The American Heritage Dictionary defines "lens" as "a thin piece of glass or plastic, as on a pair of sunglasses, that transmits light without refraction." (Windom Decl. ¶ 53.) Similarly, *The Beginner's Guide to EDC Flashlights* notes that a flashlight lens may be "a small window that protects the bulb and allows light to pass through" and further that "[m]ost common flashlights have flat lenses that don't do much to alter the beam." (Windom Decl. ¶ 53.)

12

As discussed above, Mr. Law improperly imports the specifications' references to "optical lenses" into the claimed "lens" limitation. Following the same ill-conceived thread, Coast also cherry picks various dictionary definitions to support its "optical lens" theory. Mr. Law admitted, however, that the dictionaries cited in his report are "more general dictionaries" (Law Dep., p. 62, ll. 4-5) and that the dictionaries were not cited by the patents themselves (*id.* at p. 62, l. 14). They should therefore be discounted.

This extrinsic evidence aligns with and reinforces the intrinsic record, confirming that a POSITA would understand "lens" to encompass light-transmissive covers positioned over a light source, not limited to refractive optical elements with curved surfaces.

Coast's proposed construction fails for multiple independent reasons and should be rejected.

First, it imports structural and functional limitations, curvature and refraction, that are absent from the claim language. It would render dependent claim language superfluous by collapsing beam-width modification functionality (*i.e.*, refraction) into the definition of "lens." And it excludes embodiments and prior art expressly relied upon by the PTO, including Gupta's protective lens cover. (Windom Decl. ¶¶ 54–55.)

Second, Coast's construction is improperly narrow by requiring the lens to be "transparent." A POSITA would understand this construction would exclude translucent lenses or those designed to diffuse or scatter light. (Windom Decl. ¶ 53.) Nothing in the claims or intrinsic record imposes such a restriction. Indeed, Mr. Law conceded that nothing in the claims specifically ties the lens to transparency (Law Dep., p. 58, ll. 15-18).

Finally, Coast's extrinsic evidence should be disregarded. Mr. Law acknowledged that the claims do not use the narrower, unclaimed term "optical lens" (Law Dep., p. 57, ll. 1-7), and his

13

80213555

reliance on that specification terminology reflects an improper importation of limitations into the Asserted Claims. Mr. Law's declaration is inconsistent with the intrinsic record and should be discounted. *See Phillips*, 415 F.3d at 1318.  For these reasons, the Court should reject Coast's construction.

Consistent with the claims, specification, prosecution history, and the understanding of a POSITA as explained by Mr. Windom, the Court should construe "lens" to mean: "**a light-transmissive material positioned over a light source**."

While Infinity's construction faithfully captures the POSITA's understanding that a lens in portable lighting need not refract light to qualify as a lens, Infinity alternatively proposes that to more precisely reflect the role that lenses play in the claimed headlamp, transmitting, shaping, or protecting light output, the construction may be refined as follows: "a light-transmissive element positioned over a light source to transmit, shape, or protect the light output." This refined construction accomplishes several things. First, it is broader than Coast's construction because it does not require curved surfaces, refraction, or transparency, consistent with the claim language, prosecution history, and POSITA understanding described above. Second, it is not so broad as to capture any incidental covering, the element must be "light-transmissive" and must be positioned to serve a light-related function. Third, it is consistent with every embodiment disclosed in the specification, including both the "optical lenses" of the preferred embodiment and any protective covers that appear in the prior art the Examiner relied upon. Fourth, it gives meaning to the dependent claims that add beam-width modification functions, those claims specify additional functionality (configured to increase beam width) that goes beyond what the base "lens" term requires, which is exactly how dependent claims are supposed to work.

14

### B.     "Reflector"

| Claim Term/Phrase | Infinity's Proposed Construction | Coast's Proposed Construction |
| --- | --- | --- |
| "reflector" | A component positioned specifically to direct light generated by one or more LEDs to a specified view area | A substantially conical or paraboloidal piece with a metallic or mirror-like surface for directing light |

### 1.     The Claim Language supports Infinity's Construction.

The claims use "reflector" as a structural component within each light source "to illuminate a [view area] in a [fixed] direction." ('311 patent, cl. 1.) The claims impose no requirement that the reflector be conical, paraboloidal, metallic, or mirror-like.[5] They specify no geometry, surface finish, or material composition. Coast's own expert admitted as much: Mr. Law conceded that the terms "conical," "paraboloidal," "metallic," and "mirror-like" do not appear in the patent (Law Dep., p. 80, ll. 10-25), and that he was unaware of any part of the specification that "calls out the specific shape" (*id.* at p. 84, ll. 9) or "the specific material" (*id.* at p. 84, ll. 14-15) of a reflector.

A POSITA reading claim 1 would understand "reflector" based on its function in the claim: it is a component that, together with an LED and a lens, constitutes a light source configured to illuminate a specific view area in a fixed direction. The function of directing light toward a designated area, not the shape or material of the component performing that function, is what the claims require. (Windom Decl. ¶¶ 47, 51.)

Coast's construction imposes a laundry list of structural limitations, substantially conical or paraboloidal shape, metallic or mirror-like surface, that the claims simply do not recite. Under

---

[5] These limitations proposed by Coast are based on its litigation-driven approach to claim construction. (Cordrey Dec., Ex. 5, ¶¶ 74-75 (contending that Coast's reflector is not the claimed "reflector" under Coast's construction)).

15

*Phillips*, limitations may not be imported from the specification *or extrinsic evidence* into claims that do not recite them, absent clear lexicography or disavowal. *Phillips*, 415 F.3d at 1314. There is no lexicography here, the patents never define "reflector" as a conical or paraboloidal metallic component. And there is no disavowal, the Applicant never argued during prosecution that reflectors must have these structural features.

### 2.    The Specification Reinforces Infinity's Non-Shape-Limited Proposal.

The Asserted Patents describe "reflectors" in terms of what they do, direct light generated by LEDs to particular view areas, rather than their appearance or material composition. ('311 patent 3:8-12; '618 patent 3:8-12.) The specification consistently treats reflectors as components that cooperate with LEDs to illuminate specific regions, including forward, side, rear, and far-peripheral areas. (Windom Decl. ¶ 47.)

Importantly, the specification discloses peripheral light sources (e.g., 50 and 52) that direct light sideways and rearward, as shown in FIGS. 1 and 2, without any illustrated conical or paraboloidal geometry for their reflectors. (Windom Decl. ¶¶ 47–49.) Coast's construction would directly contradict and improperly exclude these disclosed embodiments by requiring a substantially conical or paraboloidal metallic reflector.

Consistent with Infinity's construction, Mr. Law admitted that the terms "conical," "paraboloidal," "metallic," and "mirror-like" do not appear in the patent (Law Dep., p. 80, ll. 10-25). He further conceded that he was unaware of any part of the specification that "calls out the specific shape" (*id.* at p. 84, ll. 9) or "the specific material" (*id.* at p. 84, ll. 14-15) of a reflector.

### 3.    Infinity's Construction Follows the Prosecution History.

The prosecution history provides two independent bases for rejecting Coast's shape-limited construction of "reflector."

16

First, the Examiner's reliance on Gupta demonstrates that the PTO applied the term "reflector" broadly and functionally. The Examiner stated that Gupta disclosed a light source comprising "a light emitting diode, a lens, and a reflector… to direct light." (Cordrey Dec., Ex. 6 ('311 patent file history, Office Action dated Feb. 24, 2023), at 4.) Although Gupta's primary reflector embodiment is described as parabolic, Gupta expressly recognizes that "other reflector shapes may be used." (Cordrey Dec., Ex. 7 (Gupta), page 6, lines 16-18.) The Examiner did not limit his finding to Gupta's parabolic embodiment—he found that Gupta disclosed a "reflector" within the meaning of the claims, full stop. That finding, which the Applicant did not dispute, confirms that the PTO understood "reflector" to encompass non-specific shapes.

Second, and more importantly, Infinity's own prosecution arguments distinguished prior art on functional grounds, not geometric ones. During prosecution, the Applicant distinguished Gall's reflective elements by arguing that "neither the light pipes nor the reflectors described in Gall illuminate the user's view area. Both the light pipes and reflectors increase the user's visibility for other people to see." (Cordrey Dec., Ex. 8 ('311 patent file history, Dec. 8, 2022 Remarks) at 7.) This is a purely functional distinction: Gall's reflective elements don't qualify as "reflectors" within the claims not because they lack paraboloidal shape or metallic surfaces, but because they serve a different illumination function, namely making the wearer visible to others rather than illuminating the user's view area.

Mr. Law conceded this point directly. He acknowledged that in distinguishing prior art such as Gall, the applicant relied "more around the function of the reflective properties" rather than reflector shape. (Law Dep., p. 92, ll. 20-21.) This is significant: Coast's own expert acknowledges that the prosecution record reflects functional distinctions, not geometric ones. A construction that imports shape-based limitations is therefore squarely inconsistent with how the term was actually

17

applied during examination. Coast's attempt to retrofit a shape-based limitation into the term "reflector" is inconsistent with how the term was applied during examination.

### 4.    The Extrinsic Evidence Confirms Infinity's Construction Is Correct.

A POSITA would understand a "reflector" in the context of lighting devices to be a component that directs light from an LED to a usable beam or view area, without any rigid limitation on shape, size, or surface material. (Windom Decl. ¶ 48.) Industry literature confirms that reflectors "vary in size, shape, and texture." (*Id.*) For example, Encyclopedia.com aligns with the patents' functional treatment of reflectors and defines "reflector" broadly as "a piece of glass, metal, or other material for reflecting light in a required direction." (*Id.* (citing https://www.encyclopedia.com/science-and-technology/astronomy-and-space-exploration/astronomy-general/reflector).)

Moreover, when shown a patent featuring a flat reflective surface, Mr. Law admitted that the surface was in fact reflecting light and being used for its reflective properties (Law Dep., p. 88, ll. 12-15). This testimony underscores that reflective components need not be conical or paraboloidal to function as reflectors.

Coast's reliance on dictionary definitions does not warrant a narrow construction. The Oxford definition cited by Coast defines a reflector broadly as "a piece of glass, metal, or other material for reflecting light in a required direction." (Cordrey Dec., Ex. 9 (CC000605).) Again, this emphasizes function (directing light in a required direction) without imposing any conical, paraboloidal, metallic, or mirror-like limitation. (Windom Decl. ¶ 50.)

Taken together, the intrinsic and extrinsic evidence confirm that a POSITA would understand "reflector" functionally, not as a shape or material restricted component.

Conversely, Coast's proposed construction is improperly narrow and fails for multiple independent reasons.

18

First, it imports shape and material limitations, "substantially conical or paraboloidal" and "metallic or mirror-like," that appear nowhere in the claims or specification. Mr. Law conceded as much. (Law Dep., pp. 79–80, 81.)

Second, it would exclude disclosed embodiments, including the peripheral light sources shown in FIGS. 1 and 2, which do not employ conical or paraboloidal reflectors. (Windom Decl. ¶¶ 47–49.) A POSITA would understand that directing light to the far lateral periphery (at angles approaching 110 degrees from center) requires reflector geometry fundamentally different from the conical or paraboloidal shapes used in forward-directed flashlight or headlamp reflectors. (Windom Decl. ¶¶ 47-49.) The geometric principles governing light direction through a paraboloid are specifically suited to gathering light from a centrally positioned LED and projecting it forward along the paraboloid's optical axis. Redirecting light to 110-degree lateral angles requires reflector shapes designed for that specific angular output—shapes that are not conical or paraboloidal in the traditional sense. A POSITA examining the peripheral light source compartments in the patent's figures would not expect to find traditional paraboloidal reflectors oriented to send light sideways and rearward. Coast's construction, by requiring substantially conical or paraboloidal geometry for every "reflector" in the claims, would exclude the peripheral light source reflectors, components that are central to the patent's core innovation of achieving 220-degree illumination. *See also Honeywell Int'l v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (Excluding preferred or disclosed embodiments from the scope of the claims is "rarely, if ever, correct.").

Third, it is inconsistent with the prosecution history, including the Examiner's reliance on Gupta and the Applicant's functional distinction of prior art. (Law Dep., p. 88, ll. 12-20.) Fourth, Coast's construction rests on Mr. Law's "experience," rather than the intrinsic record (*Id.* at p. 82,

19

80213555

ll. 4-5). Expert testimony inconsistent with the intrinsic evidence should be discounted. *Phillips*, 415 F.3d at 1318.

Consistent with the claim language, specification, prosecution history, and the understanding of a POSITA as explained by Mr. Windom, the Court should construe "reflector" to mean: **"A component positioned specifically to direct light generated by one or more LEDs to a specified view area."**

### C. "broad-beamed lighting mode," "flood beam," "focused lighting mode," and "spot beam"

| Claim Term/Phrase | Infinity's Proposed Construction | Coast's Proposed Construction |
|---|---|---|
| "broad-beamed lighting mode," | No construction required | Indefinite under 35 U.S.C. §112(b) |
| "flood beam" | A broad or wide beam of light directed forward from the headlamp | Indefinite under 35 U.S.C. §112(b) |
| "focused lighting mode," | No construction required | Indefinite under 35 U.S.C. §112(b) |
| "spot beam" | A narrow or focused beam of light directed forward from the headlamp | Indefinite under 35 U.S.C. §112(b) |

### 1. The Claim Language as a Whole Demonstrates Definiteness.

The claim language, read as a whole, is definite. The Asserted Claims recite the phrases, "a broad-beamed lighting mode that creates a flood beam" and "a focused lighting mode that creates a spot beam." The terms "broad-beamed lighting mode" and "flood beam," as well as "focused lighting mode" and "spot beam," are not free-standing requirements; they are each parts of a single, integrated phrase that is self-defining. The claim language expressly links each mode to its result: a lighting mode that creates a flood beam and a lighting mode that creates a spot beam. Read in

20

80213555

context, these phrases plainly convey to a POSITA what is claimed and do not require further elaboration to be understood. (Windom Decl. ¶¶ 24, 30.)

Coast's effort to sever the phrases into isolated components and then declare each indefinite ignores how a skilled artisan would read the claims. As Mr. Windom explains, a POSITA would understand that a "broad-beamed lighting mode" is simply a lighting mode that produces a flood beam and that a "focused lighting mode" is simply a lighting mode that produces a spot beam. (Windom Decl. ¶¶ 23–24.) The phrases are self-contained and self-explanatory.

Mr. Law's deposition testimony confirms that these terms have an established and commonly understood meaning in the lighting field. He repeatedly acknowledged that, in general, a flood beam is wider than a spot beam and that a spot beam is narrower than a flood beam. For example, he testified that "[i]n general, the difference between a spot and a flood is that a flood is wider than a spot," and similarly agreed that "[g]enerally speaking, a spot beam is narrower than a flood." (Law Dep., p. 12, ll. 10-11). He further agreed that, in general usage, narrower beams are grouped into spot beams and wider beams are grouped into flood beams. (Law Dep., p. 46, ll. 3-5.) These concessions alone defeat any serious argument that the terms "flood beam" or "spot beam" fail to inform a POSITA of their scope.

Section 112(b) does not require numerical beam-angle cutoffs or mathematical precision. As the Supreme Court has held, a claim need only "inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Mr. Law's testimony demonstrates that POSITAs understand that a flood beam is a wide beam of light while a spot beam is a narrow or focused beam of light. That is more than reasonably certain.

21

### 2.    The Specification Reinforces Definiteness.

Further support that the claim terms are definite is found in the specification. The Asserted Patents expressly equate "broad-beamed" lighting with a "flood beam." ('311 patent 3:43-45 (A light source "can be activated to provide a **broad-beamed, i.e., flood beam**, lighting in front of headlamp 5.") (emphasis added).)  The Asserted Patents likewise equate "focused beam" lighting with a "spot beam." ('311 patent 3:39–42 (A light source "can be activated to provide a **focused beam, i.e., spot beam**, lighting in front of headlamp 5." ) (emphasis added).; '618 patent 3:39–42 (same).)

Mr. Law acknowledged that the specification uses these definitional pairings, agreeing that "focused beam, i.e., spot beam" appears in the patent and that "this patent specification is calling out the broad beam as the same as the flood beam." (Law Dep., p. 20, ll. 13–14; p. 21, ll. 15-16.) That intrinsic definitional linkage, and Mr. Law's adoption of the same linkage, eliminates any plausible indefiniteness argument.

A POSITA reading the claims in light of the specification would readily understand that "broad-beamed lighting mode" and "flood beam" describe a wide, forward-directed illumination pattern, and that "focused lighting mode" and "spot beam" describe a narrow, forward-directed illumination pattern. (Windom Decl. ¶¶ 25–26.) The specification therefore confirms, rather than undermines, definiteness.

### 3.    The Extrinsic Evidence Confirms Definiteness.

Before reaching the merits of the extrinsic record, it should be noted that Coast's own conduct is irreconcilably inconsistent with its claims of indefiniteness.

First, Coast uses the terms "spot" and "flood" to describe lighting modes on its own headlamp products, including the accused CH1000R, without  the use of numerical boundaries, angular thresholds, or formal definitions. (Windom Decl. ¶¶ 27, 32.) Coast uses "flood" to describe

22

the broadest spread-of-light mode in the CH1000R and "spot" to describe the narrow, focused beam mode. (*Id.*) Yet Coast does not provide its customers with any formal definition differentiating these modes. Notably, "[Coast] do[es] not have any definition for differentiating" "between spot and flood." (Law Dep., p. 25, ll. 11-12.)  This asymmetry is telling. Coast cannot use the same terminology in its own patents and products, without numerical boundaries, yet argue that Infinity's identical usage is indefinite.

Second, Mr. Law's own patent similarly uses "spot mode" and "flood mode" without numerical thresholds, describing spot mode as "having a narrowly focused beam" and flood mode as "having a broad beam." (Cordrey Dec., Ex. 10 (U.S. Patent No. 9,795,009), 5:40-44; *see also* Law Dep., p. 29, l. 6–p. 32  l. 6 (discussing same).) He admitted there is no further quantification. (Law Dep., p. 30, ll. 8-10; p. 30, ll. 16-18.) That is the same qualitative distinction present here.

Moreover, when pressed on whether Coast's own patent claims using "spot beam" and "flood beam" were indefinite, Mr. Law testified that he did not know how to answer that question. (*Id.* at p. 40, ll. 6-7.) An expert who cannot say whether the same terms in his own patent are definite or indefinite lacks the credibility to opine that those terms are indefinite in Infinity's patent.

### 4. The Claimed Terms Satisfy the *Nautilus* Standard.

Coast's indefiniteness theory also fails as a matter of law. It conflates the *Nautilus* standard, whether the claims inform, with reasonable certainty, those skilled in the art about the scope of the invention, with a requirement of mathematical precision that the Federal Circuit has never imposed. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).

Applying the correct *Nautilus* standard, the record demonstrates reasonable certainty: (1) "flood beam" and "spot beam" are commonly understood terms in the art, (2) the patent expressly equates "broad-beamed" with "flood beam" and "focused" with "spot beam," and (3) industry participants, including Coast and its own expert, use the terminology without mathematical

23

precision. The phrases "broad-beamed lighting mode that creates a flood beam" and "focused lighting mode that creates a spot beam" describe lighting modes that produce, respectively, a wide beam of light and a narrow or focused beam of light. POSITAs, including Mr. Law, readily understand these concepts.

As noted, Mr. Law himself testified that, in general, "a flood is wider than a spot" and that "a spot beam is narrower than a flood." (Law Dep., p. 13, ll. 12-14; p. 12, ll. 10-11.) He also agreed that narrower beams are grouped into spot beams and wider beams are grouped into flood beams. (Law Dep., p. 46, ll. 3-5.) These are not the admissions of someone who lacks reasonable certainty about the scope of these terms but are instead admissions that a POSITA understands exactly what the terms mean.

For the foregoing reasons, consistent with the intrinsic record and the understanding of a POSITA, the Court should find **no construction necessary** for "broad-beamed lighting mode" and "focused lighting mode." The Court should further construe "flood beam" to mean "**a broad or wide beam of light directed forward from the headlamp**," and construe "spot beam" to mean "**a narrow or focused beam of light directed forward from the headlamp**."

D.    "light sources(s)"

| Claim Term/Phrase | Infinity's Proposed Construction | Coast's Proposed Construction |
|---|---|---|
| "light source(s)" | One or more individual lights that cooperate to illuminate a specified view area | No construction needed |

1.    **The Claim Language Does Not Limit "Light Source" to a Single LED.**

The claim language itself resolves this dispute. For example, claim 1 of the '311 patent recites: "a first light source comprising a first light emitting diode, a first lens, and a first reflector

24

to illuminate a first view area in a first fixed direction." Under the plain language of this claim, a "light source" is not an individual LED but rather a structural unit that comprises an LED, a lens, and a reflector. An individual LED, standing alone, cannot satisfy this claim.

Coast's Mr. Law's testimony demonstrates that construction is needed because Coast's interpretation is directly at odds with this claim language. Mr. Law testified that if more than one LED is present, "it would be light sources," allegedly identifying 20 individual light sources in Figure 1 but failing to identify 20 lenses and reflectors. (Law Dep., p. 99, ll. 1-4; p. 100, ll. 13–18.) Nothing in the claims, specification, or figures supports this reading. And when asked how one would determine whether LEDs are working together as a unit, he responded, "I don't know how you would know how they're working together and how they're shining light out." (*Id.* at p. 101, ll. 16-18.) That admission underscores the need for construction: without clarification, Coast's position would invite juror confusion and interpretations that are unsupported by the intrinsic record.

Moreover, "'comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). A "light source comprising" an LED, lens, and reflector is a unit that necessarily includes all three components. It may include additional components, but it must include at least those three. An individual LED, without an associated lens and reflector, is not a "light source" under claim 1's structural definition. This correct reading prevents the arbitrary disaggregation of multi-LED arrays into individual "light sources" that would contort the claims of their proper scope.

"When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,* 521 F.3d 1351,

25

1362 (Fed. Cir. 2008). Here, Mr. Law's testimony confirms that absent construction, Coast will argue that each LED constitutes its own light source, directly contrary to the intrinsic record. Clarification is therefore necessary to prevent jury confusion and to ensure that "light source(s)" is understood consistent with how the patents use the term. (Windom Decl. ¶ 34.)

### 2.    The Specification Supports Infinity's Construction.

The specification of the Asserted Patents expressly supports construing "light source" as a grouping of one or more lights or LEDs that function or cooperate together to illuminate a specified view area. The patents explain that light sources 35, 40, 45, 50, 52, and 55 are each preferably comprised of one or more LEDs. ('311 patent 3:7–8; '618 patent 3:7–8.) The repeated use of "one or more LEDs" in describing each light source confirms that the term encompasses groupings or arrays of LEDs acting collectively, not isolated single LEDs. (Windom Decl. ¶ 35.)

Figures 1 and 2 reinforce this understanding. Each light source is identified by a single reference numeral and arrow pointing to a grouped LED array, not to individual LEDs. The figures do not assign separate numerals to individual LEDs; instead, they depict each array as a unified light source that functions collectively to produce a particular lighting mode and illuminate a specified view area. (Windom Decl. ¶ 35.)

Coast has also suggested that a light source means "one or more individual lights in a compartment." This is incorrect. First, it imports a physical limitation, "in a compartment," that appears nowhere in the claims. Second, and more fundamentally, the specification expressly shows that a single compartment can house multiple distinct light sources. Compartment 15, for example, includes three distinct and separately identified light sources (35, 40, and 45) in a single compartment. ('311 patent 3:4-6; Windom Decl. ¶ 36.) Coast's construction would collapse these three distinct light sources into one, contrary to the claims, specification, and figures.

26

Consistent with the claims, specification, and figures, a POSITA would understand that a "light source" refers to a functional unit defined by the illumination it provides, i.e., the view area it illuminates and the lighting mode it produces, rather than by the number of LEDs it contains or the compartment in which it is housed. (Windom Decl. ¶¶ 35–36.)

For these reasons, the Court should construe "light source(s)" to mean:  **"One or more individual lights or LEDs that cooperate to illuminate a specified view area."**

### E.    "Forward-directed light sources"

| Claim Term/Phrase | Infinity's Proposed Construction | Coast's Proposed Construction |
|---|---|---|
| "forward-directed light sources" | A light source configured to illuminate the central portion of a user's vision | A light source that illuminates an area in front of the user |

### 1.    The Claim Language Demonstrates the Term Refers to the Central Portion of a User's Vision.

The Asserted Claims use directional terms, i.e., forward-directed, peripheral, and downward-directed, to create a categorical framework for different types of light sources based on the direction and purpose of their illumination. These categories are defined not only by their own descriptors but by the claims' treatment of them as distinct and non-overlapping. As such. not all light emitted generally forward qualifies as "forward-directed" within the meaning of the claims.

Coast's proposed construction fails to account for how the term is used in the claims and would be understood by a POSITA. (Windom Decl. ¶ 38.) A POSITA would recognize that "forward-directed" in this context refers to a particular functional role: illumination of the straight-ahead, central field of view, as opposed to peripheral or downward illumination that may also project at least a portion of the light forward at an angle.  (Windom Decl. ¶¶ 39-41.)

80213555

Mr. Law's testimony confirms Coast's overbroad proposal. When asked whether light directed downward at his shoes could still be considered "front facing," he responded: "Down at my shoes is still going to be the front of my shoes versus the back of my shoes, so I could still consider that front facing." (Law Dep., p. 103, ll. 21-23.) He further testified, "I would think front is still going to be anything forward." (*Id.* at p. 104, ll. 6-7.) Under Coast's construction, even downward-directed light would qualify as "forward-directed," simply because it is not emitted behind the user. That interpretation disregards the claim structure and collapses distinct lighting categories into one.    (*Cf.* '311 patent, cl. 9 (even though not an Asserted Claim, claiming a "downward-directed light source")).)

### 2.    The Specification Distinguishes the Directions of Light Sources.

The specification repeatedly and expressly distinguishes forward-directed lighting from peripheral or downward-disposed lighting. In multiple passages, the Asserted Patents describe forward-directed lighting as illuminating the area straight ahead of the user; they separately describe other light sources as providing peripheral, downward-disposed, downward-directed, and/or far-peripheral illumination. ('311 patent 1:50–52, 1:67–2:8, 3:57–64; '618 patent 1:52–54; 2:2–10; 3:57–64.)

A POSITA would understand from these passages that forward-directed lighting is configured to illuminate the straight-ahead central area, or central portion, of a user's vision, as opposed to the less detailed peripheral regions. (Windom Decl. ¶ 39.) This distinction is fundamental to the claimed invention and reflected throughout the specification's description of different lighting modes and view areas.

Mr. Law himself conceded that central and downward lighting are distinct concepts. When asked about central versus downward illumination, he testified: "Central portion and the downward portion are going to be their own things." (Law Dep., p. 105, ll. 6-8.) Although he attempted to

28

group both under the umbrella of "front," that concession confirms that the patent's directional categories are meaningfully different. Coast's construction ignores that intrinsic distinction and instead substitutes a vague directional concept untethered to the patent's structure.

Infinity's proposed construction faithfully captures the specification's clear differentiation without importing extraneous limitations. It reflects the intrinsic emphasis on straight-ahead illumination that addresses the "peripheral lighting deficiency of traditional headlamps," where users were required to move their heads to re-direct spot or flood beams to illuminate peripheral areas. ('311 patent 1:53–55.)

Coast's construction is materially overbroad and inconsistent with the intrinsic record. As Mr. Windom explains, that formulation would encompass peripheral or downward light sources that project some light forward, even though the specification treats those sources as functionally distinct from forward-directed lighting. (Windom Decl. ¶ 40.) Mr. Law's testimony demonstrates precisely that problem. Under his view, any light emitted generally forward, even light directed at a user's shoes, would qualify as "front facing." (Law Dep., p. 103, ll. 21-23). That interpretation would effectively collapse downward-directed and forward-directed light sources into a single category, contrary to the claims. The patent's structure shows that the drafter knew how to distinguish these categories and did so intentionally. Claim constructions that erase meaningful distinctions drawn by the specification are disfavored. Coast's proposal does exactly that by redefining "forward-directed" to mean merely "not behind."

Infinity's construction aligns with how a POSITA would understand directional illumination in the context of headlamps and lighting devices, and thus avoids jury confusion. Those skilled in the art would understand that forward-directed light sources are designed to illuminate

29

the central portion of a user's vision, corresponding to straight-ahead viewing, rather than peripheral regions. (Windom Decl. ¶¶ 39–41.)

Mr. Law's testimony confirms the risk of confusion under Coast's construction. By equating "front" with anything not behind the user, and by treating downward illumination as potentially "front facing," Coast's approach would allow peripheral light sources to be relabeled as forward-directed. (Law Dep., p. 102, ll. 15 - 103, ll. 4). Infinity's construction prevents that improper blurring while remaining faithful to the claim language and specification.

For the foregoing reasons, and consistent with the intrinsic record and the understanding of a POSITA as explained by Mr. Windom and confirmed by Mr. Law's testimony, the Court should construe **"forward-directed light source(s)"** to mean: **"A light source configured to illuminate the central portion of a user's vision."**

F.    **"Peripheral light source"**

| Claim Term/Phrase | Infinity's Proposed Construction | Coast's Proposed Construction |
|---|---|---|
| "peripheral light source" | A light source configured to illuminate to the far peripheral portion of a user's vision | A light source that illuminates an outer part of the user's field of vision |

1.    **Infinity's Construction Is Supported by the Claim Language.**

The Asserted Claims use the term "peripheral light source(s)" to describe a category of illumination that is distinct from forward-directed lighting and is directed to portions of a user's field of vision outside the central, straight-ahead viewing area. The claim language differentiates among multiple light sources based on the portion of the user's vision illuminated, reflecting a deliberate division of lighting functions within the claimed headlamp system.

30

80213555

As used in the claims, "peripheral" modifies "light source" in a manner tied to human vision, not merely to general lateral direction. A POSITA would understand that "peripheral light source" refers to light sources configured to illuminate to the far peripheral portion of a user's vision as contrasted with forward-directed sources that illuminate the central field of view. (*Compare* Windom Decl. ¶¶ 43–44 (discussing "peripheral light source") *with* Windom Decl. ¶¶ 39–41 (discussing Forward-directed light sources").)

Mr. Law's deposition testimony confirms that the patent itself describes illumination extending to the "far peripheral." (Law Dep., p. 107, ll. 3-4 (acknowledging that the patent "called out the far peripheral being the 220 degrees").) He further testified that "[f]ar peripheral's just part of peripheral." (Law Dep., p. 106, ll. 22-23.) This confirms that "far peripheral" is not an extraneous addition but rather part of the intrinsic description of peripheral illumination. Coast's proposed construction fails to capture this distinction and provides no principled boundary between central, near-peripheral, and far-peripheral illumination.

### 2. The Specification Further Supports Infinity's Construction.

The specification repeatedly and expressly distinguishes forward-directed lighting from peripheral and far-peripheral lighting. In particular, the patents describe illumination extending to the outer boundaries of the far peripheral vision of the human eye, approximately 110 degrees to the right and left of center. ('311 patent 3:8–12; '618 patent 3:8–12.) The specification further explains that peripheral light sources are arrays of light sources that illuminates a view area extending to at least the outer boundaries of the far peripheral vision of the human eye. ('311 patent 3:15–25; '618 patent 3:15–25.)

Those skilled in the art would understand from these disclosures that peripheral lighting in the asserted patents is not limited to modest side illumination, but instead is configured to illuminate the far peripheral region of a user's vision, reaching to the extreme lateral edges of the visual field

31

as distinguished from forward-directed lighting that illuminates the central portion of a user's vision. (Windom Decl. ¶¶ 43–45.)

The Asserted Patents also explain that traditional headlamps illuminate primarily forward and require users to turn their heads to illuminate peripheral areas of interest. ('311 patent 1:50–55; 1:67–2:8; '618 patent 1:52–54; 2:2–10.) The claimed peripheral light sources address that deficiency by providing illumination extending to the far-peripheral regions without head movement. That distinction is central to the invention. Figures 1 and 2 reinforce this understanding by depicting peripheral light sources oriented to direct light laterally and rearward relative to the user, consistent with illumination extending to the far peripheral field of view. A POSITA would not equate such sources with prior-art side lights limited to narrower angular ranges. (Windom Decl. ¶¶ 43–45.)

Coast's construction is materially overbroad and lacks any objective boundary. When asked to define "outer part" without using the word "peripheral," Mr. Law struggled to provide a principled definition. He testified that peripheral vision is "what you can see to the sides of what you're looking at," describing it circularly as "your side - what you're seeing on the side." (Law Dep., p. 106, ll. 8-10.) That testimony illustrates the vagueness of Coast's formulation. Moreover, Mr. Law's acknowledgment that "far peripheral's just part of peripheral" (*Id.* at p. 106, ll. 22-23) confirms that Coast's construction collapses the patent's express far-peripheral concept into an undefined outer region. Under Coast's approach, a light source providing only limited side illumination could qualify as "peripheral," even if it does not illuminate to the far peripheral boundaries emphasized in the patents. Such an interpretation would blur the Asserted Patents' carefully structured separation between central illumination and far-peripheral illumination,

32

collapsing distinct claim categories into one. (Windom Decl. ¶ 40.) Claim constructions that erase meaningful distinctions drawn by the claims and specification are disfavored.

Infinity's proposed construction faithfully reflects how a POSITA would understand peripheral illumination in the context of headlamps and human vision. Those skilled in the art recognize that "peripheral vision" encompasses a broad angular range extending well beyond the central field of view, and that "far peripheral" refers to illumination that extends to the outermost regions of that range. (Windom Decl. ¶¶ 39–41.) By expressly tying the construction to illumination of the far peripheral portion of a user's vision, Infinity's proposal captures the core inventive concept and distinguishes the claimed invention from prior-art lighting systems that provide only limited side illumination. At the same time, Infinity's construction does not import extraneous structural limitations. It remains grounded in the intrinsic record and in the patent's repeated emphasis on far-peripheral illumination as a defining feature of the invention.

For the foregoing reasons, and consistent with the intrinsic record and the understanding of a POSITA as explained by Mr. Windom and confirmed by Mr. Law's testimony, the Court should construe **"peripheral light source(s)"** to mean: **"A light source configured to illuminate the far peripheral portion of a user's vision."**

## V.    CONCLUSION

For the foregoing reasons, the Court should adopt Infinity's proposed constructions of the disputed claim terms and find all terms definite:

| Claim Term | Infinity's Proposed Construction |
|---|---|
| "lens" | A light-transmissive material positioned over a light source. Alternatively, a light-transmissive element positioned over a light source to transmit, shape, or protect the light output. |

33

| Claim Term | Infinity's Proposed Construction |
|---|---|
| "reflector" | A component positioned specifically to direct light generated by one or more LEDs to a specified view area |
| "broad-beamed lighting mode" | No construction required |
| "flood beam" | A broad or wide beam of light directed forward from the headlamp |
| "focused lighting mode" | No construction required |
| "spot beam" | A narrow or focused beam of light directed forward from the headlamp |
| "light source(s)" | One or more individual lights that cooperate to illuminate a specified view area |
| "forward-directed light source(s)" | A light source configured to illuminate the central portion of a user's vision |
| "peripheral light source(s)" | A light source configured to illuminate to the far peripheral portion of a user's vision |

DATED this 27th day of February, 2026      Respectfully Submitted,

By: */s/Gregory S. Cordrey*
Gregory S. Cordrey
Jessica Bromall Sparkman
Madeline Lei Momi Goossen

**JEFFER MANGELS & MITCHELL LLP**
1900 Avenue of the Stars, Seventh Floor
Los Angeles, CA 90067
Telephone:  (310) 203-8080
Facsimile:  (310) 203-0567

34

80213555

Email: gcordrey@jeffer.com
Email: JSparkman@jeffer.com
Email: mgoossen@jeffer.com

Kenneth R. Davis II (OSB #971 132)
Mohammed Workicho (OSB #186140)
Email: daviskr@ballardspahr.com
Email: workichoM@ballardspahr.com
**BALLARD SPAHR**
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204
Telephone: (503)778-2100
Facsimile: (503)778-2200

*Attorneys for Defendant and Counterclaim
Plaintiff Infinity XI LLC*

35

80213555

## APPENDIX A

| Claim | Claim Language |
|---|---|
| **U.S. Patent No. 11,852,311** | |
| 1 | A headlamp, comprising:<br>a plurality of light sources, comprising:<br>a first light source comprising a first light emitting diode, a first lens, and a first reflector to illuminate a first view area in a first fixed direction from the headlamp; and<br>a second light source comprising a second light emitting diode, a second lens, and a second reflector to illuminate a second view area in a second fixed direction from the headlamp; and<br>a lighting control module configured to selectively activate the plurality of light sources according to a plurality of lighting modes,<br>where the plurality of lighting modes comprises at least a first lighting mode that activates the first light source and the second light source to illuminate the first view area and the second view area to create a total combined view area that is wider than either the first view area or the second view area alone. |
| 2 | The headlamp of claim 1, where the plurality of light sources comprises a plurality of forward-directed light sources comprising a third light emitting diode, a third lens, and a third reflector to illuminate a third view area in front of the headlamp. |
| 3 | The headlamp of claim 2, where the plurality of lighting modes comprises at least a focused lighting mode that creates a spot beam from at least one light source of the plurality of forward-directed light sources. |
| 4 | The headlamp of claim 2, where the plurality of lighting modes comprises at least a broad-beamed lighting mode that creates a flood beam from at least one light source of the plurality of forward-directed light sources. |
| 5 | The headlamp of claim 2, where the plurality of lighting modes comprises at least a night vision lighting mode that creates a colored beam from at least one light source of the plurality of forward-directed light sources. |
| 6 | The headlamp of claim 1, where:<br>the first light source comprises a first peripheral light source that is configured to illuminate the first user view area to a first peripheral side of the headlamp; and<br>the second light source comprises a second peripheral light source that is configured to illuminate the second user view area to a second peripheral side of the headlamp. |
| 7 | The headlamp of claim 6, where the plurality of lighting modes comprises at least a periphery-only lighting mode that illuminates only the first peripheral side and the second peripheral side. |
| 10 | The headlamp of claim 1, where the total combined view area of the first lighting mode is at least 220 degrees. |
| **U.S. Patent No. 12,203,618** | |
| 11 | A headlamp, comprising:<br>a first light source configured to illuminate a first view area in a first fixed direction from the headlamp;<br>a second light source configured to illuminate a second view area in a second fixed direction from the headlamp; and |

80213555

| | |
|---|---|
| | a lighting control module configured to selectively activate the first light source and the second light source according to a plurality of lighting modes, the plurality of lighting modes comprises a first lighting mode that activates the first light source and the second light source to illuminate the first view area and the second view area to create a total combined view area that is wider than either the first view area or the second view area alone. |
| 12 | The headlamp of claim 11, further comprising a plurality of forward-directed light sources, where the plurality of lighting modes comprises at least a focused lighting mode that creates a spot beam from at least one light source of the plurality of forward-directed light sources and a broad-beamed lighting mode that creates a flood beam from at least another light source of the plurality of forward-directed light sources. |

37

80213555

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February, 2026, I electronically filed the

foregoing **INFINITY XI'S CLAIM CONSTRUCTION BRIEF** with the Clerk of the Court

using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Gregory S. Cordrey*
Gregory S. Cordrey